**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| MARKING OBJECT VIRTUALIZATION INTELLIGENCE, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> HITACHI LTD.; HITACHI DATA SYSTEMS CORPORATION; AND HITACHI ID SYSTEMS, INC., <br><br> *Defendants*. | C.A. No. 2:16-cv-1055-JRG <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF MARKING OBJECT VIRTUALIZATION INTELLIGENCE, LLC'S
OPPOSITION TO DEFENDANT HITACHI, LTD.'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT
<u>UNDER FED. R. CIV. P. 12(b)(2) AND 12(b)(6)</u>**

## TABLE OF CONTENTS

I) INTRODUCTION ............................................................................................... 1

II) BACKGROUND.................................................................................................. 2

III) THE COURT HAS PERSONAL JURISDICTION OVER HITACHI LTD. ........................... 3

   A) Rule 12(b)(2) Motion To Dismiss and MOV Intelligence's Prima Facie Showing of Jurisdiction............................................................................................. 3

   B) Applicable Law for Personal Jurisdiction..................................................... 4

   C) HDS'S Contacts With Texas Must Be Imputed to Hitachi Ltd. Based On Agency Principles Subjecting Hitachi Ltd. To Specific Personal Jurisdiction In This Forum..................................................................................................... 5

      1) Hitachi Ltd.'s "Controlling" Relationship With HDS. ........................... 5

      2) Hitachi Ltd.'s "Controlling" Relationship With HDS Is Prima Facie Evidence Of Agency Warranting Imputing HDS's Contacts To Hitachi Ltd. ..................... 11

   D) HDS's Jurisdictional Contacts With Texas Must Be Imputed To Hitachi Ltd. Based On Another Reason—HDS's Alter Ego Relationship With Hitachi Ltd. ........ 15

      1) Hitachi Ltd. Wholly Owns (100%) Of HDS....................................... 15

      2) The Leadership Personnel Of Hitachi Ltd. and HDS Overlap, Including the CEO, The Executive Committee, And The Board Of Directors......................... 15

      3) Hitachi Ltd. And HDS Maintain A Central Accounting System........................ 16

      4) Hitachi Ltd. Exercises Complete Control Over HDS's General Policies. ............ 16

   E) Hitachi Ltd. Is Subject To Specific Personal Jurisdiction In Texas Based On The "Stream Of Commerce" Because Hitachi Ltd., Through HDS, Places Accused Products Into Distribution Channels........................................................................ 17

   F) Hitachi Ltd. Cannot Show That an Exercise of Jurisdiction Would Offend Traditional Notions of Fair Play and Substantial Justice........................................... 20

   G) To The Extent Factual Questions Remain, Jurisdictional Discovery Would Allow Hitachi Ltd. To Provide Additional Facts.................................................. 21

      1) Jursidictional Discovery Is Particularly Warranted Where, As Here, Defendant's Declaration Appears To Be Contradicted By Public Documents. ... 21

      2) Allowing Jurisdictional Discovery Is Strongly Favored..................................... 22

IV) MOV INTELLIGENCE'S FIRST AMENDED COMPLAINT IS MORE THAN SUFFICIENT............... 24

   A) MOV Intelligence's Direct Infringement Pleading Is Sufficient Under Twombly/Iqbal................................................................................................ 24

      1. Hitachi's Identification Of Alleged Deficiencies Is Unsupportable. ................... 25

2.  Cases Cited By Hitachi Ltd. Arose From Pleadings That Are Facially Distinguishable From Those In The FAC. ........................................................... 26

B)  The FAC Does Not Put Forward Impermissible Group Pleading. ............................ 26

C)  MOV Intelligence's Use Of "Information And Belief" Pleading Is Appropriate. ..... 28

D)  MOV Intelligence's Inducement Pleading Is Sufficient Under Twombly/Iqbal. ....... 28

E)  The FAC Should Not Be Dismissed, But If Any Portion Is, Hitachi Ltd. Is Not Entitled To Dismissal With Prejudice. ...................................................................... 30

V)  CONCLUSION. ..................................................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

Cases

*Acorda Therapeutics, Inc. v. Mylan Pharms., Inc.*,
    817 F.3d 755 (Fed. Cir. 2016) ....................................................................... 19

*AFTG-TG, LLC v. Nuvoton Tech. Corp.*,
    689 F.3d 1358 (Fed. Cir. 2012) ....................................................................... 4

*Agilent Techs., Inc. v. Elan Microelectronics Corp.*,
    2005 WL 3260162 (N.D. Cal. Nov. 29, 2005) ..................................................... 13

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
    480 U.S. 102 (1987)....................................................................................... 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................. 24, 26

*Automated Transaction LLC v. N.Y. Cmty. Bank*,
    2013 U.S. Dist. LEXIS 34872 (E.D.N.Y. Mar. 13, 2013)..................................... 27

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................... *passim*

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
    21 F.3d 1558 (Fed. Cir. 1994). .......................................................... 18, 20, 21

*Blessey Marine Servs. v. Jeffboat, LLC*,
    2011 U.S. Dist. LEXIS 13434 (E.D. La. Feb. 10, 2011) .................................... 22

*Blitzsafe Tex., LLC v. Volkswagen Grp. of Am., Inc.*,
    2016 U.S. Dist. LEXIS 124144 (E.D. Tex. Aug. 19, 2016) ............................... 25

*Celgard, LLC v. SK Innovation Co.*,
    792 F.3d 1373 (Fed. Cir. 2015) ............................................................ 4, 5, 15

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    2015 WL 5786501 (E.D. Tex. Sept. 29, 2015)............................................. 28, 29

*Daimler AG v. Bauman*,
    134 S.Ct. 746 (2014)........................................................................................ 5

*Daimler-Benz Aktiengesellschaft v. Olson*,
    21 S.W.3d 707 (Tex. App. 2000)................................................................. 16, 17

*Elecs. For Imaging, Inc. v. Coyle*,
    340 F.3d 1344 (Fed. Cir. 2003) ................................................................ 20, 21

*First Nat. Acceptance Co. v. Bishop*,
    187 S.W.3d 710 (Tex. App. 2006).................................................................... 6

*Gazian v. Wells Fargo Bank*,
    2013 WL 3290915 (N.D. Tex. June 28, 2013) ................................................. 14

*Graftech Int'l Holdings, Inc. v. GC & Co., Ltd.*,
   Case No. 12-cv-720, Dkt. No. 39 (E.D. Tex. April 8, 2014)................................................. 23

*GSK Techs., Inc. v. Schneider Elec., S.A.*,
   2007 WL 788343 (E.D. Tex. Mar. 14, 2007) ...................................................................... 16

*Guidry v. U.S. Tobacco Co., Inc.*,
   188 F.3d 619 (5th Cir. 1999) ................................................................................................. 3

*Hargrave v. Fibreboard Corp.*,
   710 F.2d 1154 (5th Cir. 1983) .............................................................................................. 15

*Harland Clarke Holdings Corp. v. Milken*,
   997 F. Supp. 2d 561 (W.D. Tex. 2014) ................................................................................ 12

*Icon Health & Fitness, Inc. v. Horizon Fitness, Inc.*,
   2009 WL 1025467 (E.D. Tex. Mar. 26, 2009.......................................................................19

*In re Chinese-Manufactured Drywall Products Liab. Litig.*,
   753 F.3d 521 (5th Cir. 2014) .......................................................................................... 11, 12

*Inamed Corp. v. Kuzmak*,
   249 F.3d 1356 (Fed. Cir. 2001). ...................................................................................... 4, 20

*Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*,
   535 F.3d 359 (5th Cir. 2008) ................................................................................................. 5

*Indus. Tech. Research Inst. v. LG Corp.*,
   2011 WL 10622246 (E.D. Tex. Nov. 29, 2011)................................................................... 20

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)............................................................................................................... 4

*Intravisual Inc. v. Fujitsu Microelectronics Am. Inc.*,
   2011 U.S. Dist. LEXIS 28100 (E.D. Tex. Mar. 18, 2011) .................................................. 28

*Jet Wine & Spirits, Inc. v. Bacardi & Co.*,
   298 F.3d 1 (1st Cir. 2002)............................................................................................... 12, 13

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984)............................................................................................................. 21

*LML Patent Corp. v. Nat'l Bank of Daingerfield*,
   2011 U.S. Dist. LEXIS 44700 (E.D. Tex. Mar. 24, 2011). ................................................. 29

*Luv N' Care, Ltd. v. Insta-Mix, Inc.*,
   438 F.3d 465 (5th Cir. 2006) ................................................................................................. 3

*Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc.*,
   2006 WL 871015 (E.D. Tex. Mar. 24, 2006) ...................................................................... 19

*McZeal v. Sprint Nextel Corp.*,
   501 F.3d 1354 (Fed Cir. 2007) ............................................................................................ 26

*Nuance Commc'ns, Inc. v. Abbyy Software House*,
  626 F.3d 1222 (Fed. Cir. 2010) ................................................................. 16, 23

*Nu-You Techs., LLC v. Beauty Town Int'l Inc.*,
  2016 U.S. Dist. LEXIS 125151 (N.D. Tex. July 7, 2016). ................................... 26

*O'Quinn v. World Indus. Constructors, Inc.*,
  874 F. Supp. 143 (E.D. Tex. 1995) ....................................................................... 5

*Opticurrent, LLC v. Power Integrations, Inc.*,
  Case No. 2:16-CV-325-JRG, Dkt. 34 (E.D. Texas Oct. 19, 2016) ................................ 28, 29

*Orchid Biosciences, Inc. v. St. Louis Univ.*,
  198 F.R.D. 670 (S.D. Cal. 2001) ......................................................................... 23

*OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*,
  2016 U.S. Dist. LEXIS 90615 (E.D. Tex. July 13, 2016) .................................... 23

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
  2004 WL 503602 (D. Del. Mar. 11, 2004) .......................................................... 20

*PLS-Pac. Laser Sys. v. TLZ Inc.*,
  2007 U.S. Dist. LEXIS 53176 (N.D. Cal. July 2007) ......................................... 27

*ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*,
  2009 WL 2834274, (E.D. Tex. Aug. 31, 2009) ..................................................... 5

Rovi Corp. v. Haier Grp. Corp.,
  2013 WL 4534641 (D. Del. Aug. 23, 2013). ................................................. 12, 14

*Ruby Sands LLC v. Am. Nat'l Bank of Tex.*,
  2016 U.S. Dist. LEXIS 83897 (E.D. Tex. June 28, 2016) .................................... 26

*Script Sec. Solutions L.L.C. v. Amazon.com, Inc.*,
  170 F. Supp. 3d 928 (E.D. Tex. Mar. 16, 2016) ................................................. 29

*SEB S.A. v. Montgomery Ward & Co.*,
  2002 WL 31175244 (S.D.N.Y. Oct. 1, 2002) ....................................................... 13

*Silicon Labs. Inc. v. Maxlinear, Inc.*,
  Case No. 12-cv-692, Dkt. No. 24 (E.D. Tex. October 11, 2012) ......................... 23

*Smith v. EMC Corp.*,
  393 F.3d 590 (5th Cir. 2004) ............................................................................... 30

Solocron Education, LLC v. HealthStream, Inc.,
  No. 2:16-cv-0016-JRG, Dkt. 81 (E.D. Tex. June 7, 2016). ............................. 2, 24

*Stripling v. Jordan Prod. Co., LLC*,
  234 F.3d 863 (5th Cir. 2000) ............................................................................... 13

*Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*,
  2014 U.S. Dist. LEXIS 28249 (E.D. Tex. Mar. 4, 2014) .................................... 29

- vi -

*Toys "R" Us, Inc. v. Step Two, S.A.*,
　318 F.3d 446 (3d Cir. 2003) ............................................................................... 22

*TQP Development, LLC v. AFLAC Inc., et al.*,
　Case No. 11-cv-00397, Dkt. No. 234 (E.D. Tex. October 15, 2012) .................... 23

*U.S. v. Jon-T Chemicals, Inc.*,
　768 F.2d 686 (5th Cir. 1985) ............................................................................... 17

*Uniloc USA Inc. v. Avaya Inc.*,
　No. 6:15-cv-1168, slip op. (E.D. Tex. May 13, 2016) .......................................... 24

*United States v. Jon-T Chems., Inc.*,
　768 F.2d 686 (5th Cir. 1985) ............................................................................... 16

*Viam Corp. v. Iowa Export-Import Trading Co.*,
　84 F.3d 424 (Fed. Cir. 1996) ................................................................................ 4

*WesternGeco L.L.C. v. Ion Geophysical Corp.*,
　776 F. Supp. 2d 342 (S.D. Tex. Mar. 2, 2011) .................................................... 27

*World-Wide Volkswagen Corp v. Woodson*,
　444 U.S. 286 (1980) ............................................................................................ 18

## Rules

Fed. R. Civ. P. 12(b)(2) .......................................................................................... 3

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1

## Other Sources

4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* (3d ed. 2004) ......... 22

Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286 (2013) .............. 25

# I)   INTRODUCTION

Plaintiff Marking Object Virtualization Intelligence, LLC ("Plaintiff" or "MOV Intelligence") instituted this action asserting claims of infringement against three Defendants: Hitachi Ltd.; Hitachi Data Systems Corporation; and Hitachi ID Systems, Inc. (collectively, "Hitachi"); MOV Intelligence alleges, *inter alia*, that Hitachi's products and services infringe MOV Intelligence's patents-in-suit related to computer authentication and security.  The parent company of the Hitachi entities named in this suit— Hitachi Ltd. ("Hitachi Ltd.") —seeks dismissal under the guise of purported "lack of jurisdictional facts."  Hitachi Ltd. attempts to insulate itself as a "Japanese corporation" by divorcing its activities from those of its wholly owned subsidiary—Hitachi Data Systems Corporation ("HDS").  Despite the presence of numerous executives in the U.S.—including Hitachi Ltd.'s Vice President and Executive Officer who apparently works (at least partially) from HDS's offices—Hitachi Ltd. contends it has no contacts with the U.S., let alone Texas and thus this Court lacks jurisdiction over Hitachi Ltd. Hitachi Ltd. is wrong.

*First*, HDS's contacts with Texas must be imputed to Hitachi Ltd., the parent company, under agency theory because Hitachi Ltd. exercises control over the activities of its subsidiaries, including HDS and Hitachi ID.  *Second*, HDS is a mere alter ego of Hitachi Ltd. such that the activities directed to Texas attributed to HDS should be ascribed to Hitachi Ltd.  *Third*, Hitachi Ltd. (through its subsidiary HDS) places components that are integrated into the infringing products into the "stream of commerce" with the expectation that HDS will distribute them throughout the United States, including distributing significant quantities HDS's offices in Dallas, Austin, and Houston, Texas and the locations of HDS's Texas customers.  *Fourth*, "fair play and substantial justice" does not defeat the existence of Hitachi Ltd.'s "minimum contacts" with Texas.  If necessary, Hitachi Ltd.'s showing under all three theories can be reinforced by jurisdictional discovery.

Hitachi Ltd. also challenges the sufficiency of MOV Intelligence's pleading under Fed. R. Civ. P. 12(b)(6).  MOV Intelligence's allegations of patent infringement are straightforward,

easy to understand, and provide clear notice to Hitachi Ltd. of what is accused of infringing and why.  In making its Motion, Hitachi Ltd. seeks to raise the pleading standard far beyond what is required by the Federal Rules.

Hitachi Ltd. is essentially asking MOV Intelligence to prove its case in the pleadings, something that has no basis in law.  ***First,*** MOV Intelligence's First Amended Complaint (Dkt. 18, hereinafter "FAC") sufficiently pleads facts supporting direct infringement.  This Court has held that a plaintiff must "identify[] a particular feature . . . from a particular product . . . that allegedly infringes a particular claim[,] . . . [Plaintiff] has provided adequate notice to [Defendant] of the plausible claims it must defend against."  *Solocron Education, LLC v. HealthStream, Inc.*, No. 2:16-cv-0016-JRG, Dkt. 81, slip op. at 7 (E.D. Tex. June 7, 2016).  MOV Intelligence's FAC more than satisfies these requirements.  ***Second***, Hitachi Ltd.'s claim that "information and belief" allegations are prohibited is unsupported in law.  Without referencing a single court opinion, Hitachi Ltd. claims that MOV Intelligence's FAC is legally deficient because it contains pleadings based on information and belief.  This contention is not only unsupported by case law, it is contrary to the law of this District.  ***Third,*** MOV Intelligence's detailed allegations are sufficient for indirect infringement.  MOV Intelligence's FAC contains facts demonstrating Hitachi Ltd. intended for customers of the accused products to infringe the patents-in-suit.   MOV Intelligence pleads that Hitachi Ltd. "provides documentation and training materials that cause customers and end users" of the accused products to "utilize the products in a manner that directly infringe" the patent.  FAC at ¶¶ 75, 108.  The FAC identifies specific documentation supporting this claim.  *Id.* at ¶¶ 75 n.12, 108 n.18.  This Court has repeatedly upheld similar allegations.

## II)   BACKGROUND

MOV Intelligence is a Plano, Texas based company that licenses a portfolio of patented technologies that were acquired and licensed from Rovi Corporation ("Rovi").  FAC at ¶ 1. Rovi is a pioneer and leader in protecting computer technology, including digital rights management ("DRM") and digital watermarking systems.  *Id.* at ¶¶ 15, 16. To facilitate the licensing of Rovi's

foundational technology, including the three patents-in-suit, Rovi licensed and/or assigned a portfolio of 233 of its patents to MOV Intelligence.  *Id.* at ¶ 2.  MOV Intelligence owns, protects and licenses Rovi's inventions to allow companies to operate in the marketplace and ensure Rovi's labor and ingenuity is compensated.

Faced with continued infringement of these patented technologies, on September 28, 2016, MOV Intelligence filed a Complaint for infringement against Hitachi Data Systems Corp. ("HDS"), Hitachi Ltd., Hitachi America, Ltd., and Hitachi ID Systems, Inc.  Dkt. 1.  On November 18, 2016, HDS and Hitachi America, Ltd. filed a motion to dismiss.  On December 2, 2016, MOV Intelligence filed a First Amended Complaint against HDS, Hitachi ID Systems, Inc., and Hitachi ID Systems (U.S.A.) Inc.

MOV Intelligence's FAC alleges that HDS and Hitachi Ltd. infringe U.S. Patent Nos. 6,802,006 ("the '006 patent") and 7,650,504 ("the '504 patent").  In addition, the FAC alleges that HDS and HID[1] infringe U.S. Patent No. 7,124,114 ("the '114 patent").

## III)   THE COURT HAS PERSONAL JURISDICTION OVER HITACHI LTD.

### A)   Rule 12(b)(2) Motion To Dismiss and MOV Intelligence's *Prima Facie* Showing of Jurisdiction,

If a party raises the defense of lack of personal jurisdiction, the non-moving party bears the burden of proving personal jurisdiction.  *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).  Although the non-moving party bears the burden, "[w]hen a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in the present case . . . the nonmoving party need only make a *prima facie* showing, and the court must accept as true the nonmover's allegations and resolve all factual disputes in its favor." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 625 (5th Cir. 1999).  Courts may consider matters outside the pleadings when conducting this analysis.  *Jobe v. ATR Mktg., Inc.*, 87 F.3d 751, 753 (5th Cir. 1996).

---

[1] MOV Intelligence dismissed its claims against Hitachi ID Systems (U.S.A.). Dkt. 32.

**B)  Applicable Law for Personal Jurisdiction.**

Federal Circuit law governs the issue of personal jurisdiction in this patent case. *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1377 (Fed. Cir. 2015).[4] Due process requires that the defendant have sufficient "minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks and citation omitted). When evaluating whether sufficient contacts exist, courts consider specific and general jurisdiction.  *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 427 (Fed. Cir. 1996).

In this case, specific personal jurisdiction exists over Hitachi Ltd.  Courts determine whether the due process requirement for specific personal jurisdiction is met by considering (1) whether the defendant purposefully directed its activities to residents of the forum state, (2) whether the claim arises out of or relates to the defendant's activities with the forum state, and (3) whether assertion of personal jurisdiction is reasonable and fair.  *Celgard*, 792 F.3d at 1377. Specific jurisdiction "arises out of" or "relates to" the cause of action even if those contacts are "isolated and sporadic."  *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1361 (Fed. Cir. 2012) (internal quotations and citations omitted).

The plaintiff bears the burden of affirmatively establishing the first two elements of the due process requirement.  *Celgard*, 792 F.3d at 1378.  The burden then shifts to the defendant to prove that personal jurisdiction is unreasonable.  *Id.*  "'The first two factors correspond with the 'minimum contacts' prong' of *International Shoe*, 'and the third factor corresponds with the 'fair play and substantial justice' prong.'" *Id.* (quoting *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001)).

The due process requirement for specific personal jurisdiction over Hitachi Ltd. is met (i) based on the agency relationship between Hitachi Ltd., the parent company, and its U.S. subsidiary, HDS; (ii) based on the alter ego relationship between Hitachi Ltd. and its U.S. subsidiary, HDS; and (iii) under the "stream of commerce" theory.

As an initial matter, it is undisputed that HDS has significant contacts with the State of

Texas, including offices in Austin, Dallas, and Houston. Hispkind Decl. Ex. 3. Further, it is undisputed then that HDS's activities purposefully directed to Texas involve the alleged conduct at issue in this case. Further, Hitachi Ltd. cannot show that exercising jurisdiction would run afoul of "traditional notions of fair play and substantial justice."

### C) HDS'S Contacts With Texas Must Be Imputed to Hitachi Ltd. Based On Agency Principles Subjecting Hitachi Ltd. To Specific Personal Jurisdiction In This Forum.

Contacts of third parties with a forum state may be imputed to a defendant under agency theory if plaintiff can show the defendant exercises control over the activities of the third parties. *Celgard*, 792 F.3d at 1379 (citing *Daimler AG v. Bauman,* 134 S.Ct. 746, 759 n. 13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.")); *ReedHycalog UK, Ltd. v. United Diamond Drilling Servs., Inc.*, 2009 WL 2834274, at *3 (E.D. Tex. Aug. 31, 2009) (quoting *O'Quinn v. World Indus. Constructors, Inc.*, 874 F. Supp. 143, 145 (E.D. Tex. 1995) ("'[a]ctions by an agent . . . can be used to establish jurisdiction over the principal. . . .'")). "Under Texas Law, agency is the consensual relationship between two parties when one, the agent, acts on behalf of the other, the principal, and is subject to the principal's control." *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp*., 535 F.3d 359, 364 (5th Cir. 2008) (internal quotations marks and citations omitted). "To prove agency, evidence must establish that the principal has both the right: to assign the agent's task; and to control the means and details of the process by which the agent will accomplish that task." *Id.*

### 1) Hitachi Ltd.'s "Controlling" Relationship With HDS.

HDS is a wholly owned subsidiary of Hitachi Ltd. Hitachi Data Systems Corporation is 100% owned by Hitachi Ltd. and is described as a Principal Subsidiary of Hitachi Ltd. *See* Hipskind Decl. Ex. 2 at F-63. In a 2015 financial report, Hitachi Ltd. states: "Subsidiaries are entities controlled by the Company. Control is obtained when the company has risks or rights to variable returns from its involvement with the entity and has the ability to use its power over the entity to affect variable returns." *Id.* at F-6.

In other words, the group led by Hitachi Ltd. "controls" subsidiaries, including HDS.

This statement alone is *prima facie* evidence that the Group operates under Hitachi Ltd.'s direction and control.  *See First Nat. Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App. 2006) (citation omitted) ("An agent is one who consents to the control of another, the principal, where the principal manifests consent that the agent shall act for the principal."); *id*. at 715 ("This demonstrates that FNAC had both the right to assign ANI's task and the right to control the means and details by which ANI accomplished the task of acquiring and purchasing promissory notes.").  Hitachi Ltd. has stated in financial disclosures that the purpose of HDS is as a "Sales company for the Company's [Hitachi Ltd.] storage [products], etc.

| **Hitachi Data Systems Corporation | California, U.S.A. | (Thousands of US dollars) 531,651 | Information & Telecommunication Systems | [100.0] 100.0 | Sales company for the Company's storage, etc. The Company's Directors, Executive Officers or employees concurrently hold position of directors or officers. |
|---|---|---|---|---|---|

Hipskind Decl. Ex. 2 at 9.

Further, Hitachi Ltd.'s control is demonstrated by at least the following:

Hitachi Ltd.'s Board Controls The Group.  Hitachi Ltd. is governed by a Board of Directors and a Chief Executive Officer.  *Id*. Ex 2.  Hitachi Ltd.'s bylaws stipulate that "the Board of Directors approves basic management policy for the Hitachi Group and supervise[s] the executive of the duties of executive offices and directors."  *Id*. at 57.  Hitachi Ltd. controls the appointment of executives at its subsidiaries.  A July 2016 press release from Hitachi Ltd. states that, "[i]n order to unify the Hitachi Group's operations in the Americas and accelerate time to market, Mr. Ryuichi Otsuki, who is currently stationed in the U.S. as CEO of Hitachi Data Systems will take on a concurrent position as Chief Executive for the Americas."  *Id.*, Ex. 10.

Hitachi Ltd.'s "One Hitachi" Initiative Enables Control.  Hitachi Ltd. manages day-to-day operations of its subsidiaries through its "One Hitachi" initiative which allows Hitachi Ltd. to control the operations of subsidiaries such as HDS.

The Hitachi Social Innovation strategy is built on this uniquely broad experience and expertise. The strategy combines the resources and advanced approaches of Hitachi Data Systems, Hitachi Consulting Corporation, the Hitachi Global Center

for Innovative Analytics, ***Hitachi, Ltd., and our many sister organizations, which collaborate as One Hitachi***.

Hipskind Decl. Ex. 22 at 2 (emphasis added).

In presentations, Hitachi Ltd. executives have described managing Hitachi Subsidiaries as part of the "One Hitachi" policy. *Id.*, Ex. 19 at 13-14. Hitachi Ltd.'s own declarant, Shigeyuki Sudo, in a 2015 article in Hitachi Review described Hitachi Ltd. as using HDS as an extension of Hitachi Ltd.'s business through the "One Hitachi" program: "Hitachi Data Systems Corporations was established in the USA to provide overseas sales offices for the overseas expansion of the mainframes business." *Id.*, Ex. 18 at 1. Mr. Sudo goes on to describe Hitachi Ltd. and HDS as implementing "One Hitachi" where Hitachi Ltd. handles day to day operations relating to IP rights for HDS products: "For file storage and content management products, for example, Hitachi conducts patent benchmarking against competing products and formulates and implements IP management plans that include targets for number of filings and plans for acquiring rights for each product." *Id.* at 4. Further, HDS acts as an agent of Hitachi Ltd. "Hitachi Data Systems also helps promote Hitachi's technical capabilities by including patent information in messages and other external communications." *Id.* at 4.

Hitachi Ltd.'s Global Manufacturing Execution System Enables Day-To-Day Management Of HDS. Hitachi Ltd. is deeply involved in the day-to-day operations of its subsidiaries including HDS through its Global Manufacturing Execution System ("GMES"). The below slide from 2016 presentation, which lists the author as "Hitachi Ltd.," describes the system as providing a "High Level Schedule" that moved Hitachi's systems from "Independent Systems" to "One Global System" that operates under the "Center of Operational Excellence." This slide is further indicia that Hitachi Ltd. operates through its subsidiary HDS.



Hipskind Decl. Ex. 7 at 5.

Hitachi executives have further stated that Hitachi's subsidiaries working with Hitachi Ltd. "[e]ngage in close dialogue in order to understand the challenges we each face" and are "working together towards a common goal." *Id.*, Ex. 7 at 4.

<u>Hitachi Ltd.'s Centralized Research And Development Programs Control HDS</u>.  Hitachi Ltd. is involved in the operations of HDS through centralizing research and development.  For example, a 2018 presentation from Hitachi Ltd. identifies Hitachi Ltd.'s "Global Center for Social Innovation," "Center for Technology Innovation," and "Center for Exploratory Research" as developing the technologies for Hitachi subsidiaries.  *Id.*, Ex. 8 at 17.  Hitachi's 2015 financial report states, "The Hitachi Group also works to improve the efficiency of R&D through close coordination between the R&D division of the Company and group companies."  *Id.*, Ex. 2 at 25. In addition, Hitachi Ltd. coordinates the actions of its subsidiaries and their interactions with customers and partners through interlocking executives at Hitachi Ltd. and HDS.  For example, Jon Schmidt, a Vice President at HDS, is described as "Responsible for leading the strategic alignment, coordination, and governance of objectives and expectations across all of Hitachi Ltd." *Id.*, Ex. 9.

<u>HDS Provides Guarantees And Indemnification For Hitachi Ltd</u>.  HDS, in publicly

*MOV INTELLIGENCE'S OPP. TO HITACHI LTD.'S MTD*
Case No. 2:16-CV-01055-JRG

available contracts, is an indemnifier for Hitachi Ltd.  In a Master Distribution Agreement between BlueArc Corporation and HDS, Hitachi Indemnified Parties are defined to include Hitachi Ltd. "'Hitachi Indemnified Party' means each of HDS and its Affiliates (including without limitation Hitachi, Ltd.) and all of their directors, officers, employees, agents." *Id.*, Ex. 26 at 5.

Hitachi Ltd. And HDS Share Common Policies.  Hitachi Ltd. has numerous policies that are enforced on its subsidiaries to coordinate activities, including a corporate credo and mission (*id.*, Ex. 12 at 1), compliance and auditing policies (*id.*, Ex. 5 at 40), human resource policy (*id.* at 42), corporate conduct policies (*id.* at 44), etc.  In addition, Hitachi Ltd. manages risk using a common risk management system across subsidiaries including HDS.

> ***Under Hitachi Ltd.'s head of risk management***, each business operation assigns an executive handling risk management to manage risks mainly concerned with compliance, export control disasters, and crime, and to respond adequately in coordination among the entire Group.  Furthermore, ***Hitachi is building a comprehensive risk management system*** that contains standards and procedures to objectively evaluate different risk that may affect business.

*Id.*, Ex. 5 at 38 (emphasis added).

Hitachi Ltd. Controls The Accounting Operations Of HDS.  The Hitachi Group accounting (including HDS) and financial data are consolidated into one Group reporting system. *Id.*, Ex. 2 at F-79 ("[T]he consolidated financial statements referred to above present fairly in all material, respects the consolidated financial position of Hitachi Ltd. and its consolidated subsidiaries.")  Further, "the Hitachi Group has documented control procedures, from company-level controls to process level controls, in accordance with policies determined by the J-SOX Committee." *Id.*, Ex. 5 at 36.  Former employees of Hitachi Ltd. subsidiaries have described that they "consolidate[d] divisional financial results and send [*sic*] reports to parent company Hitachi Ltd." *Id.,* Ex. 23.  Hitachi Ltd. also maintains an internal reporting system where "Executive Officers and employees shall report without delay to the members of the Audit Committee significant matters affecting the Company and its subsidiaries, results of internal audits, and the implementation status of reporting under the internal reporting system." *Id.*, Ex. 2 at 59.  Hitachi Ltd. has also established an internal budgeting system "in which subsidiaries report on important

issues and the progress in measures for operations to the Company." *Id.*, Ex. 2 at 60.

Hitachi Ltd. Secures Debt And Financing For HDS.  Hitachi Ltd.'s President and COO,
Toshiaki Higashihara, stated with respect to HDS's acquisition of Pentaho Corporation
("Pentaho") that "[w]e are just starting up the engine and acquisitions to acquire necessary
technologies and customer bases." *Id.*, Ex. 24.  Further, Hitachi Ltd.'s 2015 Financial Report
states that the acquisition of Pentaho by HDS was responsible for Hitachi Ltd. reporting an
increase in purchases of securities and other financial assets.  "Purchase of investments in
securities and other financial assets . . .  in the year ended March 31, 2016 was ¥196.6 billion, an
increase of ¥43.7 billion as compared with the year ended March 31, 2015, due mainly to the
acquisition of relevant businesses [including] Pentaho Corporation by Hitachi Data Systems
Corporation." *Id.*, Ex. 5 at 63.

Hitachi Ltd. And HDS Hold Themselves Out As "Hitachi."  Hitachi Ltd. and HDS both
hold themselves out to be "Hitachi."  Specifically, HDS relies on the Hitachi brand for its
business.  This brand is owned and controlled by Hitachi Ltd. and managed by the Corporate
Brand Management Office at Hitachi Ltd. and the Brand "is one of the important business
resources supporting its competitiveness, the Corporate Brand Management office controls the
group in this field." *Id.*, Ex. 4.

Help manuals for the products that give rise to MOV Intelligence's induced infringement
claims were developed by Hitachi Ltd. for the accused products and list Hitachi Ltd. as the
copyright owner.  For example, the following user manuals that relate to the accused products
contain language identifying the product as coming at least in part from Hitachi Ltd.

| Product | Manual | Identification of Hitachi Ltd. |
|---|---|---|
| Hitachi Command Suite | Tuning Manager Getting Started Guide, MK-96HC120-23 (2015) | "No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or stored in a database or retrieval system for any purpose without the express written permission of Hitachi, Ltd. . . . Hitachi, Ltd., products and services can be ordered only under the terms and conditions of the applicable Hitachi Data Systems Corporation agreements. The use of Hitachi, Ltd., products is governed by the terms of your agreements with Hitachi Data Systems Corporation."  Hipskind Decl. Ex. 20 at 2. |

| Hitachi Virtual Storage Platform | Release Notes for Hitachi VSP G200, G400, G600, G800 and Hitachi Virtual Storage Platform F400, F600, F800 | "No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or stored in a database or retrieval system for any purpose without the express written permission of Hitachi, Ltd., or Hitachi Data Systems Corporation (collectively 'Hitachi')."  *Id.*, Ex. 20 at 6. |

Further, HDS's Software License Terms cover both HDS Products and Hitachi Ltd. products.  For example, HDS's standard Software License defines equipment as "hardware and spare parts manufactured by HDS or Hitachi Ltd., or HDS has authorized You to use with the Software."  *Id.,* Ex. 21 at 1.  Further, the Software License Terms expressly contemplate that HDS will act as a distributor for Hitachi Ltd. products as the agreement excludes Hitachi Ltd. Products from Third Party Products ,which are defined as "any equipment or Software supplied to HDS by **any party other than Hitachi Ltd.** for direct or indirect distribution to end users."  *Id.*, Ex. 21 at 5 (emphasis added).  Hitachi Ltd. and HDS describe themselves as providing integrated Services under the Hitachi Brand.  "Hitachi provides IT services that address customers' diverse needs by combining Hitachi's expertise in a diverse range of business fields, including financial services, with advanced information technology.  Our services cover the entire life cycle of systems ranging from consulting to system integration, operation, maintenance, and other support."  *Id*., Decl. Ex. 1 at 13.

> **2)  Hitachi Ltd.'s "Controlling" Relationship With HDS Is *Prima Facie* Evidence Of Agency Warranting Imputing HDS's Contacts To Hitachi Ltd.**

Resolving all conflicts of fact in MOV Intelligence's favor, the Court must find an agency relationship between Hitachi Ltd. and HDS.  In this respect, *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014), is instructive.  There, the Fifth Circuit found an agency relationship between TG, a parent Chinese Corporation, and TTP, a wholly-owned subsidiary of TG and determined imputing jurisdictional contacts from TPP to TG proper.[2]  *Id*. at 528.  The Court found that "TG allowed TTP to act on its behalf, and TTP did act

---

[2] The Fifth Circuit applied Florida agency law to its jurisdictional analysis.  Florida and Texas agency principles do not differ in relevant substance: "Generally whether state or federal law applies will have no effect on the outcome, since state and federal law both utilize background principles of contract and agency law, and those principles are typically similar across jurisdictions."  *Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 580 (W.D. Tex.

on TG's behalf." *Id.* at 534.  It was also found that TG and TTP held themselves out to be the same entity," *e.g.,* "TTP employees used TG email address, fax numbers, phone numbers, business cards, and websites when dealing with customers." *Id.*  Likewise, the court determined "the entities settled each other's debts," and that "TTP was formed to conduct a narrow function for TG and it acted only to serve TG." *Id.*

In another case, *Rovi Corp. v. Haier Grp. Corp.*, the Court imputed Haier America's (U.S. subsidiary) contacts to Haier Group (foreign parent company), and found—like the Court should find here—those contacts related to the patent infringement action. No. 11–1140 (KAJ), 2013 WL 4534641 at *5 (D. Del. Aug. 23, 2013).  Specifically, the Court determined Haier America may have had "the ability to delegate day-to-day tasks to 'Chief Operating Officer[s],'" but nevertheless noted "those officers must report directly to the board of directors controlled by Haier Group appointees." *Id.* at *4.  The Court noted Haier America's board of directors is required to be and is controlled by Haier Group executives, who have full and complete authority, power and discretion to manage and control the business, affairs and properties of Haier America.  The Court further found "Haier America 'entered into an agreement titled 'Contract of Branding and Marketing,' with the subtitle 'For Haier overseas trading companies apply or use the branding budget from HQ,' referring to Haier Group," which required Haier America report financial data to Qingdao HQ." *Id.*  Based on those facts, the Court imputed Haier America's contacts to Haier Group for jurisdictional purposes.  *Id.* at *5.

Like *Chinese-Manufactured Drywall Products*, HDS was created as a company for the "Group's activities in the United States" solely to support Hitachi Ltd. in the U.S., and was likely created for U.S. distribution purposes.  For example, Hitachi Ltd. operates through HDS using it as a "[s]ales company for the Company's [Hitachi Ltd.] storage [products], etc." (Hipskind Decl. Ex. 2 at 9); "[p]urchase[s] investments in securities and other financial assets" to allow HDS to acquire companies (*id.*, Ex. 5 at 63); pays compensation for executives, including partially,

---

2014); *Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 9 (1st Cir. 2002) ("[T]echnical differences between the states' different rules of agency [not] vital . . . .").

HDS's CEO (*id.*, Ex. 10); develops the manuals for the infringing products and retains copyrights in the manuals (*id.*, Ex. 20); and uses HDS to distribute its products developed at Hitachi Ltd. Research and Development Facilities in Japan (*id.,* Ex. 7 at 7).

But for the existence of HDS, Hitachi Ltd. would have to undertake such "Group activities" in the U.S. *Agilent Techs., Inc. v. Elan Microelectronics Corp*., 2005 WL 3260162, at *4 (N.D. Cal. Nov. 29, 2005) ("If EITG did not exist, Elan would have to undertake direct sales with its clients in the United States, particularly in California."); *Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 9 (1st Cir. 2002) (same).  Hitachi Ltd. and its subsidiary HDS share Hitachi Group's leadership personnel.  For example, Mr. Ryuichi Otsuki is the CEO of HDS and Vice President and Executive Office of Hitachi Ltd.  Hipskind Decl. Ex. 11.  The Hitachi Ltd. Board of Directors makes key "strategic" decisions and the Executive Committee sets all objectives and goals for all entities of the Group.  *Id.*, Exs. 2 at 57; 5 at 33; *see Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 870 (5th Cir. 2000) ("Resolving all factual conflicts in favor of Stripling, the evidence demonstrates that before the final contract between Jordan and Stripling was signed, Jordan agreed to purchase for Guardian seventy-five percent of the eighty-percent interest that Jordan was acquiring from Stripling."); *see also SEB S.A. v. Montgomery Ward & Co.*, 2002 WL 31175244, at *3 (S.D.N.Y. Oct. 1, 2002) (finding agency relationship where U.S. subsidiary's sole function was "mostly [to] provide investor relations . . . talk and communicate with investors of" foreign parent company and "other tasks . . . performed at 'the direction of . . . the CEO of" foreign parent company.").

In addition, numerous Hitachi Ltd. executives—including the CEO of HDS—work out of offices located in the United States, and Hitachi Ltd. and HDS hold themselves out to be the same company (*i.e.,* "Hitachi"), and their employees identify themselves as "Hitachi" employees. Hipskind Decl. Ex. 4 at 5.  Hitachi Ltd. finances transactions on behalf of HDS and other subsidiaries (*id.*, Ex. 5 at 63), provides indemnification (*id.*, Ex. 22 at 5), commits Hitachi Ltd. resources in financing acquisitions by HDS (*id.*, Ex. 5 at 63), and maintains a central accounting system for the Group (*id.*, Exs. 2 at 59 and 23).  *See Gazian v. Wells Fargo Bank*, 2013 WL

3290915, at *4 (N.D. Tex. June 28, 2013) ("[A]n agency relationship can be implied through Wady's alleged actions in communicating with Plaintiffs regarding the transaction involving Kelly & Kelly. By all outward appearance, Wady's actions indicated that he was operating as intermediary for Kelly & Kelly in facilitating the transactions.").

And like the Haier entities in the *Rovi* case, Hitachi Ltd.'s CEO, Executive and other Management Committees, and the Board of Directors have absolute control over HDS. Hipskind Decl. Ex. 2 at F-6 ("***Subsidiaries are entities controlled by the Company***.") (emphasis added). Hitachi Ltd.'s CEO and Board of Directors meet regularly. "At meetings of the Board of Directors, there are detailed business briefings by each Business Unit CEO and executive offices." Hipskind Decl. Ex. 5 at 30. The Board of Directors set objectives and goals for the Group. *Id.*, Ex. 2 at 57 ("The Board of Directors approves basic management policy for the Hitachi Group and supervises the execution of the duties of the executive officers and directors"). Risk management (*id.*, Ex. 5 at 38), significant investment decisions (*id.*, Ex. 5 at 16), intellectual property management (*id.*, Ex. 18 at 1), compliance reporting (*id.*, Ex. 5 at 40), human resources, including "the Global Human Capital Database covering all Hitachi Group employees" (*id.*, Ex. 5 at 42), brand management (*id.*, Ex. 4 at 5), and accounting systems (*id.*, Ex. 2 at 59-60), are all managed centrally. The Senior Leadership Team, consisting of Senior Vice-Presidents that are appointed by the CEO of Hitachi Ltd. "aggressively incorporate the opinions of the Board of Directors into management activities." *Id.*, Ex. 5 at 31.

Hitachi Ltd. has also undertaken various centralized programs that allow it to exert control over HDS, including the "One Hitachi" initiative (*id.*, Ex. 22 at 2), the "Global Manufacturing Execution System" (*id.*, Ex. 7 at 15), the "Global Center for Social Innovation" (*id.*, Ex. 8 at 17), "Center for Technology Innovation" (*id.*) and "Center for Exploratory Research" (*id.*).

Accordingly, taking all allegations as true and viewing all disputed facts in the light most favorable to MOV Intelligence, a *prima facie* showing has been made demonstrating Hitachi Ltd.'s control over HDS. Because HDS acted as Hitachi Ltd.'s agent, HDS's uncontested

jurisdictional contacts (*e.g.*, offices in Austin, Dallas, and Houston, Texas that sell the products to customers in Texas) should be imputed to Hitachi Ltd.

**D) HDS's Jurisdictional Contacts With Texas Must Be Imputed To Hitachi Ltd. Based On Another Reason—HDS's Alter Ego Relationship With Hitachi Ltd.**

"[A] plaintiff may establish personal jurisdiction under an alter ego theory." *Celgard*, 792 F.3d at 1379. Courts have considered the following factors in deciding whether personal jurisdiction over a parent company is proper because of the acts of a subsidiary: (1) amount of stock owned by the parent of the subsidiary; (2) did the two corporations have separate headquarters; (3) did they have common officers and directors; (4) did they observe corporate formalities; (5) did they maintain separate accounting systems; (6) did the parent exercise complete authority over general policy; and (7) did the subsidiary exercise complete authority over daily operations. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983). Relevant factors, which overlap with the previous discussion, are discussed in turn.

**1) Hitachi Ltd. Wholly Owns (100%) Of HDS.**

HDS is 100% owned by Hitachi Ltd. and described as a principal or consolidated subsidiary of Hitachi Ltd. Hipskind Decl. Ex. 2 at F-64.

**2) The Leadership Personnel Of Hitachi Ltd. and HDS Overlap, Including the CEO, The Executive Committee, And The Board Of Directors**

Hitachi Ltd. "controls" is subsidiaries. *Id.*, Ex. 2 at F-6. Hitachi Ltd.'s CEO, along with the Board of Directors, lead and manage Hitachi Ltd. and HDS. As discussed above, Hitachi Ltd.'s Executive Vice President is the CEO of HDS, and maintains a "second business address" at HDS. *Id.*, Ex. 10. Hitachi Ltd.'s CEO Toshiaki Higashihara is the head of the Senior Executive Committee and serves on the Board of Directors. The Board of Directors makes key "strategic" decisions and "approves basic management policy for the Hitachi Group and supervises the execution of the duties of executive officers and directors" and subsidiaries report on important issues and the progress in measures for operations to the Company through the Company's Senior Executive Committee. *Id.*, Ex. 2 at 57, 60. In addition, Hitachi Ltd. executives work out of HDS offices. *Id.*, Ex. 10.

These facts favor a finding of an alter ego relationship.  *See Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1232 (Fed. Cir. 2010) (finding "no arms-length transactions" related to an agreement between domestic subsidiary and foreign company). Moreover, Hitachi Ltd. and HDS hold themselves out to be to be the same entity—"Hitachi"— and various initiatives, including the "One Hitachi" initiative (*id*., Ex. 22 at 2), the Global Manufacturing Execution System (*id*., Ex. 7 at 15), and the "Global Center for Social Innovation" (*id.*, Ex. 8 at 17), lead to overlapping leadership personnel between Hitachi Ltd. and HDS.  *See GSK Techs., Inc. v. Schneider Elec., S.A*., 2007 WL 788343, at *3 (E.D. Tex. Mar. 14, 2007) ("GSK presented evidence that SESA and SEHI identify and advertise themselves interchangeably as 'Schneider Electric' to promote the Square D brand."); *see also Daimler-Benz Aktiengesellschaft v. Olson*, 21 S.W.3d 707, 722-23 (Tex. App. 2000) ("The confusion of identity created by MBNA's use of Daimler–Benz's three-pointed star is some evidence that Daimler–Benz is doing business through MBNA.").

### 3)  Hitachi Ltd. And HDS Maintain A Central Accounting System.

As described above, Hitachi Ltd. centrally controls the accounting operations of HDS as accounting and financial data are consolidated into one Group reporting system.  The Audit Committee and the Board of Directors review quarterly results.  Hitachi Ltd. also centrally manages the Group's financing.  Thus, it is evident that the revenue stream from the Group (*i.e*., Hitachi Ltd. and its subsidiaries, including HDS) flow to Hitachi Ltd. (Hipskind Decl. Ex. 2 at F-6), which supports a finding of alter ego.  *See Nuance*, 626 F.3d at 1232 ("Over ninety-five percent of the profits resulting from the sale of that software flow to [foreign counterpart]."); *see also United States v. Jon-T Chems., Inc*., 768 F.2d 686, 695 (5th Cir. 1985) (finding commingling of corporate funds to support alter ego relationship).

### 4)  Hitachi Ltd. Exercises Complete Control Over HDS's General Policies.

Also, as discussed above, Hitachi Ltd. admits that "Subsidiaries [of Hitachi Ltd.] are entities controlled by the Company" and Hitachi Ltd. "has the ability to use its power over the entity to affect variable returns."  Hipskind Decl. Ex. 2 at F-6.  Hitachi Ltd.'s CEO, Executive

and other Committees, and the Board of Directors have absolute control over HDS.  Certain key "strategic" decisions are reserved specifically for the Board including the "medium-term management plan and annual budget compilation" and supervision of the "duties of executive officers."  *Id.*, Ex. 5 at 33.  A significant portion of HDS's business is managed directly by Hitachi Ltd.[3]  *See Daimler-Benz*, 21 S.W.3d at 722-23 ("Daimler Benz also exercises significant functions for MBNA and its other subsidiaries, such as obtaining financing and coordinating purchasing. Further, the management of Daimler–Benz closely supervises and directs the activities of its subsidiaries. Thus, while formally separate, Daimler– Benz and MBNA form a functional whole.").

Further, as discussed above, Hitachi Ltd.'s financial reports relating to HDS's acquisition of Pentaho in 2015 (Hipskind Decl. Ex. 5 at 63), calls into question whether HDS and Hitachi Ltd. have any separate financial existence. *See U.S. v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 694 (5th Cir. 1985) ("The fact that Farms continually had net operating losses and survived due to massive and ongoing transfusions from Chemicals does not indicate that Farms ever stood on its own two feet.  Quite the contrary; it reinforces the district court's conclusion that Farms did not have any separate financial existence.").

Accordingly, viewing all disputed facts in the light most favorable to MOV Intelligence, a *prima facie* showing has been made that demonstrates HDS maintains an alter ego relationship with Hitachi Ltd. and HDS's uncontested jurisdictional contacts with this forum (e.g., HDS's office in the State of Texas and Texas Customers) should be imputed to Hitachi Ltd.

**E)  Hitachi Ltd. Is Subject To Specific Personal Jurisdiction In Texas Based On The "Stream Of Commerce" Because Hitachi Ltd., Through HDS, Places Accused Products Into Distribution Channels.**

The "forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce

---

[3] Risk management (id., at 38), significant investment decisions (id., Ex. 5 at 16), intellectual property management (id., Ex. 18 at 1), compliance reporting (id., Ex. 5 at 40), human resources including "the Global Human Capital Database covering all Hitachi Group employees" (id., Ex. 5 at 42), brand management (id., Ex. 4 at 5), and accounting systems (id., Ex. 2 at 59-60), are all managed by Hitachi Ltd.

with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 297-98 (1980). Under the stream of commerce theory, "if the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly, or indirectly, the market for its product . . . , [then] it is not unreasonable to subject [the defendant] to suit." *Id.* at 297. For example, such a situation is one where "the defendant's contacts are the result of establishing a distribution network in the forum state for the sale of the defendant's products." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994).

Here, Hitachi Ltd., through its subsidiary HDS, places components of the accused products (servers that are installed with with Hitachi Command Suite and Hitachi Content Platform) into the "stream of commerce" via distribution channels that are established by Hitachi Ltd. Specifically, the below slide from a 2016 presentation copyrighted by Hitachi Ltd. shows Hitachi Ltd.'s IT Platform Products Division (which is part of Hitachi Ltd.) distributed its products through HDS (shown in blue).



Hipskind Decl. Ex. 7 at 7.

Further, Hitachi Ltd. has stated it uses HDS to distribute its storage products. *See Id.*, Ex. 2 at 9 (describing HDS as the "Sales company for the Company's [Hitachi Ltd.'s] storage

[products], etc."). In addition, HDS customer agreements provide that Hitachi Ltd. will provide escalation support for customers located in the United States.

> Hitachi Data Systems will provide worldwide level 1 and level 2 support for these products, using normal field escalation procedures. Level 3 support for all HDS products will be coordinated with the Technical Support Center by the TRC. *If a problem should occur with a HDS product that cannot be resolved by the TRC it will be escalated to Hitachi Ltd. in Japan.*

Hipskind Decl. Ex. 6 at 17 (emphasis added).

In addition, HDS's Chief Technology Officer, Hubert Yoshida, has stated that HDS is a distribution channel for Hitachi Ltd. products, including Hitachi Ltd.'s blade and rack servers.

> *Fortunately for HDS, x86 blade and rack servers have been developed by Hitachi ltd since 2004, and it was easy to integrate them into our portfolio and our cloud strategy.* Hitachi's advanced x86 blade servers are designed to scale in 3 dimensions with features only found in RISC based servers. Scale up as an 8 way SMP, scale out as separate nodes, and scale deep through logical partitioning.

Hipskind Decl. Ex. 25 (emphasis added).

Hitachi should reasonably expect that a portion of its products, many of which are parts of the accused infringing systems, sold by HDS will end up in areas throughout HDS's nationwide distribution network, including HDS's offices and customers in Texas. Further, "[w]ithin the United States, the State of Texas has the second largest population of any state and three of the ten most populated cities," and there is a reasonable expectation that any national distribution network will include a network in Texas. *Marshall Packaging Co., LLC v. Nestle Waters N. Am., Inc*., 2006 WL 871015, at *4 (E.D. Tex. Mar. 24, 2006).

Resolving all controverted facts in favor of MOV Intelligence, it is only reasonable to conclude that Hitachi Ltd. reasonably could have foreseen that its components in the infringing system would end up in Texas. *See Acorda Therapeutics, Inc. v. Mylan Pharms., Inc.*, 817 F.3d 755, 763 (Fed. Cir. 2016) ("even if Mylan does not sell its drugs directly into Delaware, it has a network of independent wholesalers and distributors with which it contracts to market the drugs in Delaware. Such directing of sales into Delaware is sufficient for minimum contacts."); *Icon Health & Fitness, Inc. v. Horizon Fitness, Inc*., 2009 WL 1025467, at *14 (E.D. Tex. Mar. 26, 2009) ("JHT Taiwan places products into the stream of commerce with the expectation that the North American companies will distribute them throughout the United States. Such distribution's

destination includes retailers in Texas."); *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 2004 WL 503602, at *4 (D. Del. Mar. 11, 2004) ("it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers."); *see also Indus. Tech. Research Inst. v. LG Corp.*, 2011 WL 10622246, at *5 (E.D. Tex. Nov. 29, 2011) ("LG Corp. has knowledge that at least one of the LG subsidiaries has a distribution channel in the United States that sells LG products. . . . ITRI has made a *prima facie* showing that LG Corp. and its subsidiary, LGE, placed the accused products in the stream of commerce via an established U.S. distribution channel.").

MOV Intelligence has made a *prima facie* showing that Hitachi Ltd. (through its U.S. subsidiaries) purposefully directed activity toward Texas by supplying the accused products in this case with the reasonable expectation that it may be haled into this Court.

### F) Hitachi Ltd. Cannot Show That an Exercise of Jurisdiction Would Offend Traditional Notions of Fair Play and Substantial Justice

Personal jurisdiction based on minimum contacts is presumptively reasonable, and it is "rare" that jurisdiction fails on the basis of being constitutionally unreasonable.  *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994) (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 116, 121 (1987).  Determining whether personal jurisdiction is reasonable involves balancing (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and (5) the interest of the states in furthering their social policies.  *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1363 (Fed. Cir. 2001).

Here MOV Intelligence's interest in obtaining relief is obvious.  Hitachi Ltd. is actively distributing products that infringe on MOV Intelligence's patents and reaping significant benefits from such sales at MOV Intelligence's expense.  MOV Intelligence's only recourse is to hold Hitachi Ltd. responsible for its infringing activities within the United States.  The interests of the forum state and the interstate judicial system are also substantial.  Texas "has an interest in

discouraging injuries that occur within the state." *Beverly Hills Fan Co.*, 21 F.3d at 1568 (citing

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984)).  That interest extends to patent

infringement actions.  *Id.*  Texas also has a "substantial interest in cooperating with other states

to provide a forum for efficiently litigating plaintiff's cause of action."  *Id.*  As Plaintiff "will be

able to seek redress in [Texas] for sales of the accused [product] to consumers in other states . . .

[t]hese other states will . . . be spared the burden of providing a forum for [Plaintiff] to seek

redress for these sales." *Id.*

Personal jurisdiction in Texas does not impose a substantial burden on Hitachi Ltd.

Hitachi Ltd. has already accepted service and Hitachi Ltd.-controlled entities maintain offices in

Texas (Hipskind Decl. Ex. 3).  Thus, Hitachi Ltd. fails to demonstrate "that this is one of the

'rare' situations in which sufficient minimum contacts exist but where the exercise of jurisdiction

would be unreasonable." *Elecs. For Imaging, Inc.*, 340 F.3d at 1352 (citing *Beverly Hills Fan

Co.*, 21 F.3d at 1568).

**G) To The Extent Factual Questions Remain, Jurisdictional Discovery Would Allow
Hitachi Ltd. To Provide Additional Facts.**

To the extent the Court determines that factual questions remain, it should allow limited

jurisdictional discovery to clarify the record.  Hitachi Ltd. has rejected MOV Intelligence's

request to take jurisdictional discovery relevant to this Motion.  This is particularly problematic

as MOV Intelligence was unable to test the veracity of the statements of Hitachi's declarant.

**1) Jursidictional Discovery Is Particularly Warranted Where, As Here,
Defendant's Declaration Appears To Be Contradicted By Public Documents.**

In support of its Motion, Hitachi puts forward the declaration of Shigeyuki Sudo for the

proposition that Hitachi Ltd. "has no employees in the State of Texas."  Dkt. No. 41-1 at 2.

However, public documents appear to contradict this statement.  Hitachi Ltd.'s "Deputy General

Manager of the Social Innovation Business Division" lives in Westlake, Texas.  *See* Hipskind

Decl. Exs. 16 and 17 (showing property records for Abdessamad Hicham, "Deputy General

Manager" of Hitachi Ltd.'s "Social Innovation Business Division").  Further, Mr. Sudo's claim

that Hitachi Ltd. "has also not purposely directed any activities at residents of the State of Texas"

is contradicted by Hitachi Ltd.'s own documentation.  For example, Hitachi Ltd., in a 2014 press release stated that it had sold custom proton beam therapy systems to Texas customers:

> We are very pleased to introduce PROBEAT-RT to the US market, in conjunction with the first inaugural PTCOG-NA scientific meeting, hosted by the University of Texas MD Anderson Proton Therapy Center." Hitachi's Executive General Manager, Particle Therapy Division, Fumito Nakamura, said in a statement.

Hipskind Decl. Ex. 14.

Further, press releases from Hitachi Ltd. identify Hitachi Ltd. products operating at the MD Anderson Cancer Center thus far have "treated total 4,564 [sic] patients and 980 patients with spot scanning till June 2013." *Id.,* Ex. 15 at 7.[4]

### 2)   **Allowing Jurisdictional Discovery Is Strongly Favored.**

It is well settled that a court may allow discovery to provide the parties the opportunity to ascertain facts that are relevant in determining personal jurisdiction.  *See Oppenheimer Fund, Inc.,* 437 U.S. at 351.  The Fifth Circuit has indicated that if "a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained." *Fielding v. Hubert Burda Media, Inc.,* 415 F .3d 419, 429 (5th Cir. 2005) (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)); *accord* 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1067.6 (3d ed. 2004) (noting that jurisdictional discovery can be obtained "when there is some basis for believing that [it] would be fruitful").  Courts have rejected efforts by defendants to shield themselves from jurisdictional discovery, as discussed in *Blessey Marine Servs*:

> ***Defendant resists Plaintiff's request for jurisdictional discovery, contending that Plaintiff has thus far not made out a prima facie case*** for either specific or general jurisdiction.  Defendant's argument may be sound if the Fifth Circuit had adopted the rule, apparently applicable in the Second and Seventh Circuits . . . But, as noted above, the Fifth Circuit has suggested that a plaintiff need only to present "factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts," ***or to otherwise show that jurisdictional discovery would not be wholly futile, in order to obtain such discovery***.

*Blessey Marine Servs. v. Jeffboat, LLC,* 2011 U.S. Dist. LEXIS 13434, at *17-18 (E.D. La. Feb.

---

[4] *See also* Hipskind Decl. Ex. 13 ("Hitachi, Ltd., Japan, and its subsidiary Hitachi America, Ltd., will supply the major equipment (accelerator, beam lines, gantries, nozzles and treatment couches) for the facility [referring to the Texas M.D. Anderson Cancer Center].").

10, 2011) (emphasis added).

Courts in this District have consistently found that, where a "preliminary showing" of jurisdiction has been made, jurisdictional discovery is warranted.[5] "[D]iscovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted *or where a more satisfactory showing of the facts is necessary*." *Baker Hughes, Inc. v. Homa*, 2012 U.S. Dist. LEXIS 60224, 35-36 (S.D. Tex. Apr. 30, 2010) (emphasis added) (citing *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1235 (Fed. Cir. 2010)). If more information as to the relationship between HDS and Hitachi Ltd. is required to determine the propriety of jurisdiction, those facts are uniquely within the possession of HDS and Hitachi Ltd. In such a case, courts are particularly empowered to permit discovery. *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, 2016 U.S. Dist. LEXIS 90615 (E.D. Tex. July 13, 2016) (discovery deemed necessary because "the facts necessary to establish personal jurisdiction and propriety of venue [were] exclusively within defendant's knowledge.").

To the extent Hitachi Ltd.'s Motion is not denied outright, which it should be, discovery is likely to uncover additional information bearing on the jurisdictional inquiry. MOV Intelligence "should be allowed explore the quality, quantity and nature of all of Defendant's contacts with this forum and draw its own conclusions and proffer its own arguments as to whether Defendant should be subject to personal jurisdiction in this Court." *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 674 (S.D. Cal. 2001). Courts have found that the burden on a defendant such as Hitachi Ltd. to resist such discovery is ***relatively high***. "To defeat the discovery sought here, Defendant must meet the relatively high burden of establishing that it is

---

[5] *Graftech Int'l Holdings, Inc. v. GC & Co., Ltd.,* Case No. 12-cv-720, Dkt. No. 39 at 16-17 (E.D. Tex. April 8, 2014) (ordering jurisdictional discovery as the Plaintiff "had made a preliminary showing of jurisdiction, sufficient to convince this Court that its jurisdictional allegation can be supplanted through discovery."); *TQP Development, LLC v. AFLAC Inc., et al.,* Case No. 11-cv-00397, Dkt. No. 234 at 3 (E.D. Tex. October 15, 2012) (Schneider, J) (finding that although Plaintiff "has made a preliminary showing of jurisdiction sufficient to warrant jurisdictional discovery is a close one," "the Court orders [Defendant] to respond to the discovery within fifteen days."); *Silicon Labs. Inc. v. Maxlinear, Inc.,* Case No. 12-cv-692, Dkt. No. 24 at 2-3 (E.D. Tex. October 11, 2012) (finding that jurisdictional discovery was warranted as the Plaintiff has made a "preliminary showing of jurisdiction.").

clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction." *Id.* at 674-75 (citation omitted).

## IV) MOV INTELLIGENCE'S FIRST AMENDED COMPLAINT IS MORE THAN SUFFICIENT.

### A) MOV Intelligence's Direct Infringement Pleading Is Sufficient Under *Twombly/Iqbal.*

MOV Intelligence's FAC is "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and thus meets the pleading standard for direct infringement.  MOV Intelligence has told Hitachi Ltd. what products it believes infringes the '006 and '504 patents, as well as representative claims that the accused products infringe.  For example, with respect to the '006 patent, MOV Intelligence identifies the accused products as the "Hitachi Command Suite Versions 8.0.0, 8.1.0, 8.2.1, 8.4, 8.4.1, and 8.5.0" and the "Hitachi Content Platform Versions 7.1.2, 7.2, 7.2.1, 7.2.2, and 7.2.3." FAC at ¶¶ 29-30.  MOV Intelligence further identifies a number of claims that Hitachi Ltd. infringes. *Id.* at ¶¶ 71 (enumerating four separate claims MOV Intelligence accuses Hitachi of infringing).  MOV Intelligence's FAC discusses Hitachi Ltd.'s direct infringement of the '006 patent over 50 paragraphs and 13 pages. *Id.* at ¶¶ 28-78. The FAC provides similarly detailed allegations regarding Hitachi Ltd.'s infringement of the '504 patent.  *See id.* at ¶¶ 80-111.  These detailed pleadings provide more than enough information to show that Hitachi Ltd. plausibly infringes the '006 and '504 patents.

Rule 8(a) does not require "element-by-element infringement contentions within the original complaint to properly state a claim for direct infringement under the *Twombly-Iqbal* standard." *Solocron Education, LLC v. HealthStream, Inc.*, No. 2:16-cv-0016-JRG, Dkt. 81, slip op. at 5 (E.D. Tex. June 7, 2016).  "By identifying a particular feature . . . from a particular product . . . that allegedly infringes a particular claim[,] . . . [Plaintiff] has provided adequate notice to [Defendant] of the plausible claims it must defend against." *Id.* at 7; *see also Uniloc USA Inc. v. Avaya Inc.*, No. 6:15-cv-1168, slip op. at 7 (E.D. Tex. May 13, 2016) (concluding the plaintiff stated a claim for direct infringement by identifying with specificity representative claims from each patent-in-suit that are allegedly infringed, identifying by name the accused

products, describing the accused functionality); *Blitzsafe Tex., LLC v. Volkswagen Grp. of Am., Inc.*, 2016 U.S. Dist. LEXIS 124144, at *19 (E.D. Tex. Aug. 19, 2016).

### 1.   Hitachi's Identification Of Alleged Deficiencies Is Unsupportable.

Hitachi Ltd. claims that the FAC fails to plead facts establishing various elements of the claims.  Hitachi Ltd.'s arguments are attempts to argue its non-infringement theories at the pleading stage and ignore the specific allegations in the FAC.  For example, Hitachi Ltd. claims that the complaint fails to plead any facts "regarding any pointers or locations that are in need of fixing up by a program loader.'" Mot. at 6.  But the FAC pleads that the Hitachi Content Platform "is a system wherein an executable image has one or more pointers needed for fixing up by a program loader." FAC at ¶ 37.  The FAC also alleges that the Hitachi Command Suite "identifies the pointers that are in need of 'fixing-up' in the dictionary map files." *Id.* at ¶ 56. The FAC goes on at length explaining how the Hitachi Content Platform and Hitachi Command Suite contain pointers in need of "fixing up" by program loaders and specifically point to and include images from Hitachi documentation illustrating MOV Intelligence's infringement allegations. *Id.* at ¶¶ 32-70, 82-104.

Despite MOV Intelligence's in-depth pleading, Hitachi Ltd. asks this Court to require an element-by-element comparison of the patent with the accused product at the pleading stage, which plainly is not required by Rule 8.  "[I]n most patent cases, asking the plaintiff to provide an element-by-element analysis of the accused device in the complaint does not advance the goals of the Federal Rules of Civil Procedure.  [Rule 8] was drafted to combat the 'debilitating technicalities and rigidity that characterized the prior English and American procedural systems.'" *Blitzsafe*, 2016 U.S. Dist. LEXIS 124144 at *17 (quoting Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. Rev. 286, 288-89 (2013)).  Put simply, MOV Intelligence pleads facts that, at minimum, allow Hitachi Ltd. to infer that the clearly-defined accused products infringe the '006 and '504 patents.

### 2. Cases Cited By Hitachi Ltd. Arose From Pleadings That Are Facially Distinguishable From Those In The FAC.

Hitachi Ltd. relies on cases where the pleadings were markedly different from MOV Intelligence's detailed allegations.  In *Ruby Sands LLC v. Am. Nat'l Bank of Tx.,* the complaint was a mere seven pages long and the allegations contain nothing more than a recitation of the claim elements.  *See* Hipskind Decl. Ex. 14.  The Court in *Ruby Sands* found that the direct infringement allegations were lacking because there was no allegation that the defendant sold mobile devices (which was an element of the claim).  *Ruby Sands LLC v. Am. Nat'l Bank of Tex.,* 2016 U.S. Dist. LEXIS 83897, at *11 (E.D. Tex. June 28, 2016).

Hitachi Ltd.'s citation of *Nu-You Technologies v. Beauty Town International Inc.*, is similarly unavailing.  In *Nu-You*, the Court found the allegations were lacking because the direct infringement allegation was predicated on the defendant performing the "method of sculpting hair."  *Nu-You Techs., LLC v. Beauty Town Int'l Inc.*, No. 3:15-CV-03433-N, 2016 U.S. Dist. LEXIS 125151, at *4 (N.D. Tex. July 7, 2016).  However, the Court found that the unsupported allegations that the defendant performed the method steps were speculative.  *Id.*  The court did not find that the complaint was improper because it pled facts "on information and belief;" it dismissed the complaint because the facts alleged, even on information and belief, did not support an inference of infringement.  In contrast, here the FAC alleges in great detail that the accused products contain the infringing functionality, supporting an inference of infringement.

MOV Intelligence's FAC contains the facts necessary under *Twombly* and *Iqbal* to "raise a right to relief above the speculative label."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  No other facts are necessary for the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

### B)      The FAC Does Not Put Forward Impermissible Group Pleading.

Hitachi Ltd. also incorrectly argues that MOV Intelligence has not apprised the Hitachi defendants of the specific allegations against them because all allegations are directed to more than one Hitachi defendant instead of individually.  Mot. at 25, n.18.  The Federal Circuit approved a pleading against defendants without distinction between the infringing acts

performed by each one.  *See McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed Cir. 2007) (finding that a complaint alleging only that "defendants" had offered an infringing product for sale, without regard to which of the two defendants specifically had offered the product for sale, contained "enough detail to allow the defendants to answer").

Here, the FAC clearly alleges that each of HDS and Hitachi Ltd. are liable for direct and induced infringement for "mak[ing], sell[ing], offer[ing] to sell, import[ing], and/or us[ing]" the products accused of infringement.  FAC ¶¶ 34, 70-78, 84, 104-111.  Each Defendant has been adequately put on notice of the direct and indirect infringement allegations against it.  There is nothing vague or inherently contradictory about alleging that two defendants are infringing in the same way, and MOV Intelligence reasonably believes that each defendant is liable for all conduct alleged against it.  Hitachi Ltd.'s case law does not hold group pleading is invalid under *Iqbal* and *Twombly per se*; rather, it holds that specific instances of group pleading are subject to dismissal.  Hitachi Ltd.'s citation to *Automated Transaction* is unavailing.  In *Automated Transaction*, unlike here, there was no allegation that the two defendants (a parent and subsidiary) were both selling the product.  Instead, the complaint grouped them together without alleging an alter-ego theory in support, leading to confusion about which defendant was accused of what.  *Automated Transaction LLC v. N.Y. Cmty. Bank*, 2013 U.S. Dist. LEXIS 34872 (E.D.N.Y. Mar. 13, 2013).  No such confusion exists here.  MOV Intelligence pleads that both Hitachi Ltd. and HDS directly infringe the '006 and '504 patents.

Hitachi Ltd.'s reliance on *PLS Pacific Laser* is likewise misplaced.  Mot. 20 n.11.  In *PLS Pacific Laser*, the plaintiff grouped together eight different defendants and alleged infringement against all eight of them even though they comprised unrelated companies and even individuals. *PLS-Pac. Laser Sys. v. TLZ Inc.*, 2007 U.S. Dist. LEXIS 53176 (N.D. Cal. July 2007).  Where more than one defendant has sold the same product (as is alleged in the FAC), Courts have found grouping these defendants together to be permissible.  *WesternGeco*, 776 F. Supp. 2d at 363-364. The Court in *WesternGeco* stated that it was "declin[ing] to follow these cases [including *PLS-Pacific Laser*] and instead adopt[ing] an approach [it] believe[s] to be approved by the Federal

Circuit in *McZeal*." *Id.*

**C) MOV Intelligence's Use Of "Information And Belief" Pleading Is Appropriate.**

Hitachi Ltd. claims that the FAC's use of "information and belief" pleading is a "improper." Mot. at 4-5.  However, case law from this District clearly supports the use of this language in pleadings.  As here, "the specifics of precisely how [a defendant's] products work and where, when, and to whom [defendant] makes, uses, sells, offers to sell, or imports its allegedly infringing products is clearly more accessible to [defendant] than to Plaintiff," pleading "on information and belief" is "generally deemed permissible."  *Intravisual Inc. v. Fujitsu Microelectronics Am. Inc.*, 2011 U.S. Dist. LEXIS 28100, at *16-17 (E.D. Tex. Mar. 18, 2011). MOV Intelligence's use of "on information and belief" does not change the detailed nature of MOV Intelligence's pleadings discussed above.

**D) MOV Intelligence's Inducement Pleading Is Sufficient Under *Twombly/Iqbal.***

MOV Intelligence's FAC recites detailed facts explaining how Hitachi Ltd. induces customers and end users of the accused products to induce infringement of the '114 patent. FAC at ¶¶ 72-75, 106-108. To adequately plead induced infringement, MOV Intelligence's "complaint must (1) adequately plead direct infringement by the defendant's customers, (2) contain facts plausibly showing that the defendant specifically intended for its customers to infringe, and (3) contain facts plausibly showing that defendant knew that the customer's acts constituted infringement." *Opticurrent, LLC v. Power Integrations, Inc.*, Case No. 2:16-CV-325-JRG, Dkt. 34, slip op. at 4 (E.D. Texas Oct. 19, 2016) (*citing Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 2015 WL 5786501, at *2 (E.D. Tex. Sept. 29, 2015)).

MOV Intelligence's FAC contains facts satisfying each of these three requirements. First, MOV Intelligence's FAC states that customers and end users of the accused products directly infringe the '006 and '504 patents.  FAC at ¶¶ 75, 108.  Second, MOV Intelligence's Complaint contains facts showing that Hitachi Ltd. specifically intended for customers of the accused products to infringe the '006 and '504 patents.  *Id.*  MOV Intelligence's FAC explains that Hitachi Ltd. intended its customers to infringe because (1) it provides products that, through

their normal and customary use, infringe; and (2) Hitachi Ltd.'s promotions, user manuals, customer support, and training induce users of the accused products to infringe. *Id.* MOV Intelligence's pleading is sufficient.  This Court has previously upheld similar allegations as establishing, at the pleading stage, a defendant's specific intent to induce patent infringement. *See Script Sec. Solutions L.L.C. v. Amazon.com, Inc*., 170 F. Supp. 3d 928, 936-37 (E.D. Tex. Mar. 16, 2016); *Opticurrent*, No. 2:16-CV-325-JRG, Dkt. 34, slip op. at 5.

Third, MOV Intelligence's FAC contains facts showing that Hitachi Ltd. knew that purchasers and end users of the accused products directly infringed the '006 and '504 patents. MOV Intelligence alleges that Hitachi Ltd. had knowledge of the '006 patent "since at least service of [the] Complaint or shortly thereafter" and that Hitachi "knew of the '006 patent and knew of its infringement, including by way of this lawsuit."  FAC at ¶ 73; *id.* at ¶ 107 (same for the '504 patent).  "[T]he Court has held that there is no pre-suit knowledge requirement to establish induced infringement."  *Opticurrent*, No. 2:16-CV-325-JRG, Dkt. 34, slip op. at 5 (citing *Tierra Intelectual Borinquen, Inc. v. ASUS Comp. Int'l, Inc.*, No. 2:13-cv-44, 2014 U.S. Dist. LEXIS 38570, at *2 (E.D. Tex. Mar. 24, 2014)). The Complaint sufficiently pleads that Hitachi Ltd. induces infringement of the '006 and '504 patents.

Hitachi Ltd. relies on *Tierra Intelectual Borinquen, Inc. v. ASUS Computer Int'l, Inc.*, 2014 U.S. Dist. LEXIS 28249 (E.D. Tex. Mar. 4, 2014) to support its argument that Plaintiff fails to plead Hitachi Ltd.'s specific intent to encourage customers' infringement. Mot. at 21.  *Tierra Intelectual* is readily distinguishable.  In that case, the Court considered indirect infringement allegations against OfficeMax, a retailer who simply sold a product allegedly infringed by customers who purchased the accused product through OfficeMax.  *Id.* at *2-3.  In the present case, unlike *Tierra Intelectual*, Hitachi Ltd. is not a retailer with a lack of knowledge as to how its customers use the products it sells.  Within the context of this case, Plaintiff's allegations that Hitachi Ltd. "specifically intended and [was] aware that the normal and customary use of the accused products would infringe the [patents-in-suit]" and Hitachi Ltd.'s provision of "user manuals, product support, marketing materials, and training materials" (FAC, ¶¶ 75, 108) is

sufficient to state a claim of induced infringement.  *Core Wireless Licensing S.A.R.L.,* 2015 U.S. Dist. LEXIS 135468, at *9-10.

### E)  The FAC Should Not Be Dismissed, But If Any Portion Is, Hitachi Ltd. Is Not Entitled To Dismissal With Prejudice.

HDS filed a Motion to Dismiss MOV Intelligence's original complaint, Dkt. 15, and instead of opposing the motion and consuming Court resources, MOV Intelligence attempted to address the alleged issues in its original complaint by filing a FAC.  Dkt. 18.  Hitachi Ltd. was not served when MOV Intelligence filed its original complaint.  Instead, it was served only after the filing of the FAC.  Dkt. 29.  The instant Motion represents Hitachi Ltd.'s first response to MOV Intelligence's infringement claims.

As explained in this Opposition, Hitachi Ltd.'s arguments in support of its Motion to dismiss fail.  Plaintiff respectfully requests the Court deny Hitachi Ltd.'s Motion in full.  To the extent the Court agrees with any of Hitachi Ltd.'s arguments, MOV Intelligence requests leave to amend to comply with the announced pleading standards.  Hitachi Ltd.'s claim that the FAC should be dismissed with prejudice is contradicted by controlling case law. *Smith v. EMC Corp.,* 393 F.3d 590, 595 (5th Cir. 2004) (holding that leave to amend should be "freely given" and identifying five considerations that may counsel against a trial court granting leave to amend). The factors identified in *Smith v. EMC*[6] are not at issue here given the early stage of the proceedings, lack of prejudice to Hitachi Ltd., and that MOV Intelligence has only amended its pleading once.  None of the *Smith* factors apply here.  MOV Intelligence simply seeks to advance this case to the merits stage and "leave sought should be 'freely given.'" *Id.*

### V)      CONCLUSION

For the foregoing reasons, this Court should deny Hitachi Ltd.'s motion to dismiss.  This court may exercise personal jurisdiction over Hitachi Ltd. and MOV Intelligence's detailed allegations of infringement are more than proper.

---

[6] "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id.*

Dated: July 24, 2017

Respectfully submitted,

/s/  Dorian S. Berger_____
Elizabeth L. DeRieux (TX Bar No. 05770585)
D. Jeffrey Rambin (TX Bar No. 00791478)
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, Texas 75647
Telephone: 903-845-5770
E-mail: ederieux@capshawlaw.com
E-mail: jrambin@capshawlaw.com

OF COUNSEL:

Dorian S. Berger (CA SB No. 264424)
Daniel P. Hipskind (CA SB No. 266763)
BERGER & HIPSKIND LLP
1880 Century Park East, Suite 815
Los Angeles, CA 90067
Telephone: 323-886-3430
Facsimile: 323-978-5508
E-mail: dsb@bergerhipskind.com
E-mail: dph@bergerhipskind.com

*Attorneys for Marking Object Virtualization
Intelligence, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this July 24, 2017 with a copy of this document via the Court's CM/ECF System per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ Daniel P. Hipskind_____
Daniel P. Hipskind
